## THE PAPOOSE.

## PETROLEUM NAVIGATION CO. v. UNITED STATES.

### Nos. 13146, 13592.

District Court, E. D. New York.

Aug. 8, 1935.

See, also, The Papoose, 2 F.Supp. 43.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Charles E. Wythe, of New York City, of counsel), for the United States.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for steamship Papoose, the Petroleum Nav. Co.

INCH, District Judge.

The tank steamer Papoose ran into the U. S. S. Wright as the latter was approaching Hampton Roads. From this collision these suits have arisen. The United States of America has sued for the damages done to the Wright, while a cross-libel was filed by the Petroleum Navigation Company, owner of the Papoose.

The U. S. S. Wright is an airplane tender about 500 feet long, 67 feet beam, drawing 24 feet, 13,500 tons displacement. She had 80 officers and 450 men.

. The Papoose is a tank steamer 423 feet long, 53 feet beam, drawing 31 feet, 6,177 gross tons displacement. She was bound out from Hampton Roads, having come from Baltimore, and was on her way to Trinidad, British West Indies. She had dropped her Baltimore pilot about fifteen minutes before the accident.

The master of the Papoose was on the bridge in charge of her navigation, the third officer was on watch on the bridge, and a lookout was stationed forward. This lookout was not produced as a witness.

The collision occurred on May 2, 1931, about 8:20 p. m. The weather was clear overhead and inshore, but over beyond the port side of the Papoose there was a heavy fog bank and there were stretches of this fog or haze rolling along the surface of the water in front of her. The visibility was therefore somewhat low.

A patch of this light fog was enveloping the Papoose. . The U. S. S. Wright, however, was clear of it both ahead and on her port side. Capt. Fitch, U. S. N., of the Wright, who was on the bridge, said that there was no fog ahead of the Wright or on her bow, that he could see ahead for 7 miles.

The Papoose, which was on the starboard side of the Wright, was thus obscured from the lookouts of the Wright until just before the collision.

Out of this obscuring haze the Papoose suddenly appeared running at full speed until suddenly the green light of the Wright appeared on her port bow. She then sounded an alarm, put her helm hard aport, but was unable to avoid the collision and the port bow of the Papoose cut into the starboard bow of the Wright, near one of the forward guns, doing considerable damage.

The collision was sufficient to keel the Wright over to port and the Papoose rebounded. Thereafter, after it had been duly ascertained whether assistance was needed, the Wright proceeded to her anchorage in Hampton Roads. As I have said, the lookout on the Papoose was not called as a witness nor was the quartermaster.

In view of this collision, an explanation is required on the part of the Papoose and, as is usual, both vessels blame the other.

In substance, the Papoose claims that the fault all lay with the U. S. S. Wright in that she did not blow fog signals and did not have proper lookouts.

On the other hand, the U. S. S. Wright places the blame squarely upon the Papoose, and in my opinion correctly so.

The Papoose was hidden from the Wright, but the Wright was not hidden from the Papoose. On the contrary, due to the low-lying quality of this fog or haze and possibly because there was a higher bridge on the Papoose or the range lights of the Wright was stronger, it is undisputed that those in charge of the Papoose saw the range lights of the Wright at the time when the Papoose had stopped in order to drop her Baltimore pilot and fully fifteen minutes before the collision.

This condition of the surface of the water was apparent, nevertheless, after the

pilot had left her, the Papoose proceeded at full speed through this haze on the careless assumption that these range lights of the Wright indicated a vessel at anchor. Ordinary nautical skill would have shown that this was not so and that the U. S. S. Wright was moving.

These conditions required those in charge of the Papoose to observe carefully whether the Wright was stationary or was moving in the direction towards which the Papoose was turning, and if the Papoose then had kept her course and speed there would have been no collision, but, on the contrary, the Papoose would have safely passed, over a mile astern of the Wright. The Papoose did nothing of this kind, but in spite of the fact that she clearly saw these range lights and should have known that they were on a moving vessel, nevertheless, she proceeded on a southeast course, at full speed, although concealed by the fog, during which period the Wright had proceeded on her course a distance of almost 2 miles, and ran into the Wright as above stated.

She now blames this collision upon the Wright in spite of the above facts on the theory that the Wright should have blown fog whistles. The Papoose also had blown no fog whistles, but the difference of this omission, so far as affecting a decision in these suits is concerned, is substantial.

■ The Wright had a heavy fog bank some distance away on her starboard bow and there was this rolling fog or haze nearly on her starboard bow and while, although all was clear on her port bow and dead ahead for approximately 7 miles, nevertheless, the situation required her to blow fog whistles. The William H. Taylor (C.C.A.) 278 F. 717; The Perkiomen (D.C.) 27 F. 573.

■ Failure to perform this duty, however, becomes important only where it reasonably caused or contributed to the collision. Such failure did not cause the accident in this case. The purpose of fog signals is to warn other vessels of the presence of the vessel giving the signal. In this case the Papoose had no reason for a further warning as she already knew of the presence of the Wright and by the exercise of even ordinary nautical skill should have known that if she kept up her converging course and speed she was liable to run into this vessel whose lights she was observing, according to her master, all the time up to the time of the collision.

There can be no question but that the Papoose did not need a fog signal from the Wright to locate her or avoid the careless maneuver of the Papoose. Nor is there any failure on the part of the Wright, made apparent from the testimony, to have sufficient lookouts. In fact, the unusual inference is indicated by counsel for the Papoose, that she had too many. Her commanding officer was on the bridge, the officer of the deck was on the starboard wing, the executive officer was on the port wing, and the chief quartermaster was in the wheel house, another quartermaster was on duty assisting the officer of the deck, two lookouts were stationed in the eyes of the ship, and there were two other lookouts, one on each wing of the bridge.

The Wright was proceeding on a course laid down in the United States Coast Pilot and at a reasonable speed, and, as a matter of fact, was preparing to enter Hampton Roads in the usual manner and along the usual course for vessels so entering.

On the other hand, the Papoose was obscured by this haze and a fog signal from her was essential to indicate her location. The testimony shows that if such a fog signal had been given in accordance with this duty resting upon those in charge of the Papoose, the collision might have been avoided by the Wright which was entering on a usual course, unaware of the presence of the Papoose because of the obscuring haze and this lack of a fog signal.

Thus in the case of the Papoose the failure to perform this duty resting upon her clearly contributed to cause the collision.

■ Under these circumstances, therefore, the Papoose was grossly at fault in proceeding at excessive speed, while knowingly hidden in the fog, without blowing a fog signal, and on a deliberate course which would converge with that of the Wright, when reasonable nautical skill and caution would have shown, in ample time to avoid the collision, that the Wright, whose lights were continually seen, was approaching the course of the Papoose which, if the Papoose maintained her course, would bring them into collision.

■ Where the Papoose was so grossly at fault, this court need not diligently search for any possible fault on the part of the other vessel. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L. Ed. 84; The Umbria, 166 U.S. 404, 17 S. Ct. 610, 41 L.Ed. 1053; The Victory, etc.,

168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The Persian (C.C.A.) 224 F. 441; The Hokendauqua (D.C.) 270 F. 270.

Libelant is entitled to a decree with costs. The cross-libel is dismissed.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA following section 723), findings of fact and conclusions of law in accordance herewith may be submitted.

Submit decree in usual form.